**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 138, INTERNATIONAL UNION OF OPERATING ENGINEERS AFL–CIO, Respondent.**

No. 319, Docket 26562.

United States Court of Appeals Second Circuit.

Argued Jan. 26, 1967.

Decided June 29, 1967.

Leonard M. Wagman, Washington, D. C., Atty., N. L. R. B. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Glen M. Bendixsen, Atty., N. L. R. B., on the brief), for petitioner.

William J. Corcoran, New York City (Corcoran and Brady, New York City, on the brief), for respondent.

Before MOORE and FRIENDLY, Circuit Judges, and BRYAN,* District Judge.

MOORE, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its supplemental decision and order, 151 N. L. R. B. 972 (March 23, 1965), determining the amounts of back pay due to certain individuals. The Board had originally found in 1959, 123 N. L. R. B. 1393, that Local 138 of the International Union of Operating Engineers, AFL-CIO (hereafter Union) had violated §§ 8(b) (1) (A) and 8(b) (2) of the Taft-Hartley Act, 29 U.S.C. §§ 158(b) (1) (A) and 158(b) (2) and that various employers violated §§ 8 (a) (1) and 8(a) (3), 29 U.S.C. §§ 158 (a) (1) and 158(a) (3), by maintaining a closed shop and an illegal union hiring hall, and by discriminating against certain men so as to discourage activities protected by § 7, 29 U.S.C. § 157. This Court, on the Board's petition, modified and enforced the resultant Board order, 2 Cir., 293 F.2d 187 (1961),[1] in an opinion fully setting out the facts surrounding the discriminations. We will not repeat those facts here.

Following this Court's decision, the Union and the Board were unable to agree on the amounts of back pay due to the various discriminatees. Thereafter, in accordance with § 102.52 of the Board's Rules and Regulations, 29 C.F.R. § 102.-

---

* Of the Southern District of New York, sitting by designation.

1. The principal modification by this Court was to make the liability of the employers for back pay secondary to the liability of the Union. The reported decree of this Court was handed down on July 25, 1961. This decree was amended (not reported, at the request of the Board on November 9, 1961 to include a number of discriminatees not included in the original decree.

52,[2] the Board's regional Director prepared a back pay specification which, together with a notice of hearing, was served on the Union on March 7, 1963.[3] Under the Board's rules, the Union was required to file an answer putting in issue those parts of the back pay specification which it intended to contest;[4] a hearing would then have been held to resolve the contested issues. To faciliate a fuller understanding of the procedural difficulties that followed the initial service of the back pay specification, the contents of the specification will be briefly described.

*The Back Pay Specification:*

Paragraph I sets forth the scope of the back pay provisions of the Board's order as enforced by this Court. Thus, the following individuals were to be compensated for losses resulting from the various Union acts of discrimination: (a) Walter W. Miller for discrimination against him on the East Meadow School project; (b) William H. Wilkens for the discrimination against him on the Northville Dock project; (c) John J. DeKoning for the discrimination against him on the Roosevelt Field contract; (d) Albert J. Bruder for similar discrimination at Roosevelt Field; and (e) William H. Wilkens, Thomas Eichacker, Charles Skura, Peter Batalias, John J. DeKoning, Albert J. Bruder, Walter W. Miller and any other members of the reform group[5] for pay losses resulting from the Union's discriminatory operation of its hiring hall. In addition, paragraph I stated that in all cases, back pay was to be computed in accordance with the *Woolworth* formula, i.e., back pay was to be calculated using each quarter of the year as a separate unit. See discussion of formula, infra.

Paragraphs II–V set out the computations of back pay for Miller, Wilkens, DeKoning and Bruder for losses on the several projects mentioned above, specifying awards of $65.20, $91.54; $3,194.85 and $–0–, respectively.

Paragraph VI sets forth the Regional Director's computation of the net back pay due to the eight employees whose claims arose from the Union's discriminatory operation of its hiring hall. The ninth member of this group, John J. DeKoning, received full back pay under paragraph IV of the specification and thus no additional claim was made on his behalf under paragraph VI. Paragraph

2. Section 102.52 provides:

   "Initiation of proceedings; issuance of back-pay specification; issuance of notice of hearing without back-pay specification.

   "After the entry of a Board order directing the payment of back pay or the entry of a court decree enforcing such a Board order, if it appears to the regional director that a controversy exists between the Board and a respondent concerning the amount of back pay due which cannot be resolved without a formal proceeding, the regional director may issue and serve upon all parties a back-pay specification in the name of the Board. The specification shall contain or be accompanied by a notice of hearing before a trial examiner at a place therein fixed and at a time not less than 15 days after the service of the specification. In the alternative and at his discretion, the regional director, may under the circumstances specified above, issue and serve upon the parties a notice of hearing only, without the back-pay specification, the hearing to be held before a trial examiner, at a place therein fixed and at a time not less than 15 days after the service of the notice of hearing."

3. The companies which are secondarily liable for certain aspects of the back pay award were also duly served with the back pay specification but failed to answer or take any part in the supplemental proceedings. To the extent of their secondary liability, they, of course, are bound by the ultimate resolution of the back pay dispute in these and further proceedings.

4. 29 C.F.R. § 102.54.

5. A small number of men who desired to overturn the union management for what they considered to be gross mismanagement and improper administration of union affairs. See this Court's former opinion, 2 Cir., 293 F.2d at 189–190. In addition to the men listed, Garrett Nagle and Frank Ziegelbauer were included in the group of "reformers" who were discriminated against.

VI(a) sets forth the respective periods of discrimination for each of the eight while paragraph VI(b) sets forth in detail the formula used by the Regional Director to calculate the awards, the actual calculations being set forth in numerous appendices to the back pay specification. Finally, a summary at the end of the specification lists the awards for each discriminatee [6] which totaled $95,685.59.

*Procedural Developments:*

The Union failed to file an answer to the specification within fifteen days of the date of service as required by the Board's rule, but on April 17th, the Regional Director granted the Union's request for an extension. Thereafter, the Union filed a general denial denying each and every allegation of the specification. On May 16th, the Board's General Counsel moved before the Trial Examiner to strike the Union's answer for failure to comply with the Board's pleading rule § 102.54(b), 29 C.F.R. § 102.54 (b),[7] for judgment on the pleadings and for issuance of a recommended order. The Union requested and received permission from the Trial Examiner to file an amended answer.

On June 4, 1963, the Union filed an amended answer in which it alleged (1) that the *Woolworth* quarterly formula was grossly inequitable and should not be used, (2) that the back pay period should end at the date of the Board's interim order, (3) that the computation of back pay for William H. Wilkens under paragraph III of the specification was erroneous as the job to which Wilkens was referred terminated the day after he reported to work and was discriminated against, (4) that the computation of back pay for John J. DeKoning under paragraph IV was erroneous in that the employees he was compared to were men of superior skill to DeKoning, (5) that the formula used by the Regional Director to calculate back pay due to the reform discriminatees was erroneous and inaccurate for various reasons, (6) that the correct way to figure back pay was to compare the earnings of members of the Union of comparable skill and seniority to the discriminatees, and (7) that the computations under the formula were inaccurate as based upon "incorrect and misleading information furnished to the Board by the discriminatees." The General Counsel's response to this pleading was to file another motion to strike conceding only that the Union had put Wilkens' back pay under paragraph III into issue. After the hearing had begun, the Trial Examiner granted the General

6. The individual awards were as follows:

| | |
|---|---|
| Peter Batalias | $16,123.00 |
| Albert J. Bruder | 13,266.00 |
| John J. DeKoning | 3,194.85 |
| Thomas Eichacker | 12,490.00 |
| Walter W. Miller | 9,277.20 |
| Garrett Nagle | 9,666.00 |
| Charles Skura | 13,069.00 |
| William H. Wilkens | 7,987.54 |
| Frank Ziegelbauer | 10,612.00 |
| Total | $95,685.59 |

7. Section 102.54(b) provides:
   "(b) *Contents of the answer to specification.* The answer to the specification shall be in writing, the original being signed and sworn to by the respondent or by a duly authorized agent with appropriate power of attorney affixed, and shall contain the post office address of the respondent. The respondent shall specifically admit, deny, or explain each and every allegation of the specification, unless the respondent is without knowledge, in which case the respondent shall so state, such statement operating as a denial. Denials shall fairly meet the substance of the allegations of the specification denied. When a respondent intends to deny only a part of an allegation, the respondent shall specify so much of it as is true and shall deny only the remainder. As to all matters within the knowledge of the respondent, including but not limited to the various factors entering into the computation of gross back pay, a general denial shall not suffice. As to such matters, if the respondent disputes either the accuracy of the figures in the specification or the premises on which they are based, he shall specifically state the basis for his disagreement, setting forth in detail his position as to the applicable premises and furnishing the appropriate supporting figures."

Counsel's motion in its entirety. On the Union's immediate appeal to the Board, however, the Trial Examiner was reversed and the Union was granted leave to file a second amended answer "showing with specificity the names and earnings of union members with seniority and ability comparable to those discriminatees named in Paragraph VI(A) of the back pay specification."

On August 19, 1963, the Union filed its second amended answer alleging that to base back pay computations on employers' quarterly contributions to the Union Welfare Fund was totally arbitrary as many employers failed to contribute anything to the fund despite employing union members and that in calculating the back pay due the various discriminatees, the Board should take into consideration the amount of time during the back pay period that the discriminatees took off from their jobs to engage in anti-union administration activities.[8] In response to the Board's order that the Union specify the names and earnings of union members comparable to the discriminatees, the Union stated that it was unable to agree with the Board as to the identity of such union members. Instead, the Union attached to its answer a list of earnings of over twenty union members for the years 1955–58, which list the Union claimed contained the names of union members suggested by both sides. In an appendix, the Union also challenged the specification's statement that discriminatee Frank Ziegelbauer was physically capable of undertaking the type of work normally assigned to union members. Finally, the Union incorporated by reference all the allegations contained in its first two answers.

The General Counsel, on September 16th, moved to strike the second amended answer, conceding only that the propriety of the Regional Director's formula and the award to Ziegelbauer had been put in issue. The Trial Examiner granted the motion in its entirety, and was upheld by the Board on the Union's immediate appeal. Thus, in the final analysis, the Union was allowed only to litigate (1) the award to Wilkens under paragraph III of the specification, (2) the award to Ziegelbauer, (3) the propriety of the back pay formula used by the Board, and (4) whether the reform discriminatees had removed themselves from the labor market during the back pay period as a result of engaging in anti-union administration activities.

*The Hearing:*

At the hearing, the Board's Regional Compliance Officer, Sidney H. Levy, testified at length concerning the formula he had adopted for the Regional Director to calculate the back pay due the eight employees whose claims arose from the discriminatory operation of the union hiring hall.[9] Levy testified that the very nature of the construction industry—the fluctuation of contract rates, the seasonal variations, the tremendous variety of equipment that union men operated, the different skills required to operate different machines (virtually no employee could operate every piece of construction machinery, regardless of his skill)—makes it extremely difficult to determine what a given employee will earn over a given period. Levy had first considered a formula based upon daily records of referrals and job applications made through the Union's hiring hall, but such records were not available. An alternative method based upon the earnings of employees comparable to the discriminatees was abandoned when the Regional Director and the Union could not agree on the identity of comparable employees. Finally, a formula was selected whereby each discriminatee's earnings

---

8. The Union alleged that members of the reform group worked against the Union administration by taking extended trips to Washington and Chicago, engaging in picketing and making TV appearances.

9. Actually, Levy's testimony was broken in the middle to accommodate the Union's expert witness, Herbert Schultheis. Thus, the following account of the evidence taken at the hearing is not in chronological order.

during the three-year period prior to the discrimination would be compared to the average union member's earnings during the same period. The ratio of discriminatee's earnings to the average union member's earnings thus established for each discriminatee was then projected into the back pay period and applied to the average earnings of a union member for each quarter during the back pay period. Thus, for example, if discriminatee "A" earned 25% more than the average union member during the pre-discrimination period, the average earnings for any given quarter during the back pay period would be multiplied by 125% to arrive at discriminatee "A's" back pay award for that period. Of course, any earnings discriminatee "A" received from other employment for that quarter would be deducted from the quarterly award.

To obtain an approximation of the average union member's earnings for the period in question, the quarterly reports of the Union's Welfare Fund were used which reflected the total amounts of contributions received from employers for all union members in their employ during a given period. By multiplying the aggregate contribution of employers by the reciprocal of the percentage rate of contribution, the total earnings of the entire union membership for a given quarter were obtained. For example, if employers contributed $1,000 during a given quarter and they were expected to contribute 4% of wages paid, then the total wages earned by union members for that quarter would be $25,000 (25 × 1,000). Dividing the total wage figure

by the number of men in the Union yielded the average union member's wage for the quarter.

The Union called Herbert Schultheis, a Certified Public Accountant and a member of the firm that served as accountants for the Union and the Welfare Fund. Schultheis testified that he was able to arrive at the 1952 earnings of some 179, out of approximately 450, union members [10] by looking at certain employer statements filed in connection with the administration of the Welfare Fund.[11] Using these figures, Schultheis computed the average 1952 annual wages of 40% of the union membership. He did not break his figures down into quarters as the Board had requested. Upon the representation that Schultheis would carry his calculations through each of the pre-discrimination and discrimination years, the Trial Examiner continued the hearing from October 8 to October 29, 1963, instructing Schultheis to work out his proposed formula. When Schultheis resumed the stand, he produced figures only for the years 1955 through 1961, thus failing to provide figures for the prediscrimination years 1953 and 1954, and had not broken his figures down into quarters. The Trial Examiner thereupon struck Schultheis' testimony from the record.[12]

Also at the hearing, discriminatees Eichacker, Batalias, Bruder, Wilkens and Nagle were made available for examination by counsel for the Union with respect to their anti-union administration activities. However, the Trial Examiner blocked all attempts of the Union's counsel to question these discriminatees

10. Schultheis limited his enquiry to members of Local 138, the branch of the International Union to which the discriminatees belonged. The Regional Director's formula based on aggregate employer contributions to the Welfare Fund did not distinguish between Local 138 and Locals 138A and 138B. The latter two branches of the International Union contained apprentices and permit men—admittedly on a lower scale of wages from the Local 138 members. The Union (Local 138) attacks this aspect of the Regional Director's formula as grossly arbitrary

and unfair. We fail to see, however, that any prejudice resulted to the Union from the Regional Director's use of the larger unit, as the same base was used in the prediscrimination period as in the back pay period.

11. These records were apparently not complete and thus could not provide figures for the entire membership of Local 138. See note 10, supra.

12. An immediate appeal to the Board from this ruling was denied.

as to their other activities during the back pay period relevant to their job availability on the grounds that such matters were not put into issue by the Union's pleadings.

Other evidence taken at the hearing concerned the capacity of Ziegelbauer to operate the type of machinery which union members were normally expected to operate.

The Trial Examiner rendered a decision adopting the same figures set forth in the Regional Director's back pay specification calling for total back pay by the Union of $95,685.59. The Board agreed with the Trial Examiner and amended his decision only to the extent of directing the addition of 6% interest, such interest to accrue from the date of the Board's order. This enforcement proceeding followed.

*The Propriety of the Back Pay Formula:*

The major thrust of the Union's resistance to the Board's petition for enforcement of the back pay award is an attack on the formula adopted by the Regional Director and approved by the Trial Examiner and the Board. The Union asserts that the use of employer contributions to the Union Welfare Fund as a basis for calculating back pay is arbitrary and unreasonable for several reasons. It argues that employer contributions for a given quarter do not represent wages actually paid during that quarter since employers do not make contributions based on a given quarter's earnings until the following quarter. Furthermore, employers are not always diligent in turning over their contributions to the Fund, so payments may lag behind earnings even more than if the system worked according to plan; and it is said that a number of employers do not make contributions at all. The Union also objects to the fact that the formula does not distinguish between union members who are apprentices and permit men and the members who are more comparable in skill and seniority to the discriminatees.[13] Several other

deficiencies in the Board's formula are also raised by the Union. The Union concludes by arguing that the formula and supporting figures of Schultheis should have been used to arrive at a just result.

██ It is well settled that the Board is vested with broad discretion to fashion a back pay remedy to make employees whole in a given situation. NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 346–347, 73 S.Ct. 287, 97 L.Ed. 377 (1953), Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 198–199 (1941). As the Eighth Circuit has observed, NLRB v. Brown & Root, Inc., 311 F.2d 447, 452 (8th Cir. 1963):

> "Obviously, in many cases it is difficult for the Board to determine precisely the amount of back pay which should be awarded to an employee. In such circumstances the Board may use as close approximations as possible, and may adopt formulas reasonably designed to produce such approximations."

██ We believe the Board acted well within its discretion in adopting a formula based upon employer contributions to the Union Welfare Fund. The Union's objections noted above demonstrate that the formula was not perfect, a fact not contested by Compliance Officer Levy, but do not show how the Union was prejudiced by the imperfections. Thus, for example, the fact that employer contributions to the Fund for one quarter represent wages earned in another, may or may not work to the Union's prejudice in a given situation. The Union has failed to offer proof either way. One would expect any errors in calculations due to this factor would cancel out over any substantial period of time. As concerns the reliability of the Welfare Fund figures, we note only that the Union has failed to produce any more reliable figures.

The Trial Examiner rejected the Union's alternate method of calculating back pay as being deficient in several

---

13. See note 10, supra.

respects.[14] We find the Trial Examiner's ruling on this matter, as adopted by the Board, to have been sound. The wages Schultheis gleaned from the Welfare Fund records at his disposal did not represent wages of the entire union membership. No information was provided to show how the skills and seniority of the men listed related to the skills and seniority of the discriminatees and no prediscrimination period was used to establish a ratio between the prediscrimination earnings of the discriminatees and the earnings of the selected employees.

*The Woolworth Formula:*

' The Union objects particularly to the Board's use of the *Woolworth* formula in calculating the amount of back pay due the discriminatees. Under that formula, adopted by the Board in F. W. Woolworth Co., 90 N.L.R.B. 289 (1950), approved by the Supreme Court in NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287 (1953), and used consistently by the Board ever since, see, e. g., Oman Construction Co., 144 N.L.R.B. 1534 (1963), enforced, 338 F.2d 125 (6th Cir. 1964), cert. denied, 381 U.S. 925, 85 S.Ct. 1561, 14 L.Ed.2d 684 (1965), each quarter during the back pay period is considered as a separate unit with the back pay award for a given quarter being the difference between an employee's loss of pay due to the unfair labor practice and the employee's interim earnings from other employment. If in a given quarter an employee earns more from other employment than he would have on his original job absent the unfair labor practice, he, of course, receives no back pay award for that quarter, but the excess of his other income over lost income would not be applied to reduce the back pay award in another quarter. Under the Board's pre-*Woolworth* system, the entire back pay period was treated as a unit with interim earn-

ings for the whole period being deducted from the gross back pay figure.

The Board stated in *Woolworth* that the "cumulative experience of many years" disclosed that treating the entire back pay period as a unit "falls short of effectuating the basic purposes and policies of the Act." There appeared to be a basic problem with the old method. When employees entitled to reinstatement and back pay managed after some period to obtain higher paying jobs than their original jobs, their net back pay due was progressively reduced and eventually entirely eliminated as their higher earnings offset their earlier loss of earnings. In such circumstances, it would be in an employer's interest to delay reinstatement to reduce the amounts it would have to pay, or it might lead employees to waive reinstatement to toll the running of the back pay period. In either case, the National Labor Relations Act's principal aim of compelling reinstatement would be thwarted. A second problem with the old system involved the protection of employees' Social Security pensions which apparently depend upon an employee earning a minimum wage each quarter. Under the old system, there was no way of allocating the back pay award to specific quarters to satisfy the Social Security requirement.

The Supreme Court in NLRB v. Seven-Up Bottling Co., supra, held that the Board had properly exercised its discretion and utilized its administrative expertise in adopting the quarterly base period, noting only that the Board should not apply a formula based upon its experience without due regard for the circumstances of a particular case. 344 U.S. at 349, 73 S.Ct. 287.

■ The Union argues that the use of the *Woolworth* formula in this case is arbitrary and unreasonable. It urges that the construction industry is so highly seasonal that comparing quarterly

14. We noted above that the Trial Examiner struck Schultheis' testimony from the record. It is not necessary for us to determine whether that action was an abuse of discretion, as in his decision, the Trial Examiner considered Schultheis' testimony on the merits and rejected it.

earnings of union members with quarterly earnings of discriminatees from other, perhaps non-seasonal, employments is unreasonable. However, the figures contained in the back pay specification belie the Union's position that the average wages of union members fluctuate wildly from quarter to quarter. Thus, for example, according to the Regional Director's figures, the greatest fluctuation in average quarterly earnings in any one year during the three-year pre-discrimination period occurred in 1954, when first-quarter earnings were $1,107 as compared with $1,404 in the third-quarter. Variations in the backpay period tended to be somewhat greater, the most extreme example being 1958, when average second-quarter earnings were $1,193 while third-quarter earnings were $1,967. While on their face, these variations seem significant, we have not been shown that they were of a magnitude sufficient to compel the Board's departure from a method of back pay calculation employed for the better part of two decades. In fact, by our calculations (the Union did not supply any figures to back up its claim of prejudice) the total back pay claim against the Union of $95,685.59 would have been reduced by only $6,293.26,[15] had the Board not used the quarterly formula. We thus hold that the Board acted within its discretion in using the *Woolworth* formula.

*Foreclosure of Proof at the Hearing:*

The Union asserts that the ruling of the Trial Examiner blocking the questioning of the reform group discriminatees on job availability and interim earnings, except for their anti-union administration activities,[16] was erroneous and highly prejudicial to its attempt meaningfully to challenge the provisions of the back pay specification. We have already detailed the successive attempts

of the Union to frame pleadings acceptable to the General Counsel and the Trial Examiner. We must now determine whether the Trial Examiner's restrictive rulings on job availability, as adopted by the Board, were correct.

The Board's pleading rule § 102.54(b), Contents of the answer to specification, 29 C.F.R. § 102.54(b),[17] requires a respondent to be specific in contesting the various provisions of a specification. General denials are definitely not acceptable. Recent cases uphold the Board's position that anything seeking to effect a reduction of back pay must be raised by a respondent as an affirmative defense. See NLRB v. Mooney Aircraft, Inc., 366 F.2d 809, 813 (5th Cir. 1966), citing NLRB v. Miami Coca-Cola Bottling Co., 360 F.2d 569, 575 (5th Cir. 1966), NLRB v. Mastro Plastics Corp., 354 F.2d 170 (2d Cir. 1965), cert. denied 384 U.S. 972, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966), and NLRB v. Brown & Root, Inc., 311 F.2d 447 (8th Cir. 1963). In Mastro Plastics Corp., this Court, in placing on the Board the burden of producing employees to testify on the issue of willful loss of earnings, emphasized the need for pleading the issue of job availability in the respondent's answer.

The closest the Union came to affirmatively putting in issue the back pay activities of the reform group discriminatees was in its first amended answer wherein it alleged that the back pay specification calculations were based upon "incorrect and misleading information furnished to the Board by the discriminatees." The Union's second amended answer contained only a statement that the discriminatees made themselves unavailable by engaging in anti-union administration activities—the issue litigated at the hearing. Thus, it seems clear that the Union failed to plead with

15. This figure, of course, might become greater if on the remand we order infra, the Union is able to establish greater interim earnings on the part of the discriminatees.

16. The Trial Examiner concluded that the anti-union administration activities of the

discriminatees took up short periods, varying in the individual case from a day or two to slightly over a week, at times when they were out of work and thus did not affect the size of the back pay award. The Union does not contest this finding.

17. See note 7, supra.

the specificity required by the Board's rules the job availability of the reform discriminatees.

But once the discriminatees were present at the hearing, there seems to be no adequate reason why the Union should not have been allowed to amend its answer to cover the issues of job availability and interim earnings. Under § 102.57, "After the opening of the hearing, the specification and the answer thereto may be amended upon leave of the trial examiner or of the Board, as the case may be, good cause therefore appearing." At the hearing, when the first reform discriminatee, Thomas Eichacker, was called to the stand by the Union, the Union attempted to question him concerning a back injury he had sustained which might have rendered him unfit to operate heavy construction equipment and also attempted to question him with respect to his operation of a gas station during the back pay period, the fact of which was not reported to the Board. Repeatedly blocked from asking these questions, counsel for the Union moved to amend his answer to raise the issue of job availability, but this motion was also denied. Similar attempts to question broadly the other reform discriminatees on job availability were also blocked. The Trial Examiner rested his denial of the Union's requests on "tremendous loss of time, and money, and the fact that these discriminatees have gone over eight years now without back pay." On the other hand, the back pay specification had been served on the Union only in March, 1963, the ruling in question having been made in October, and it does not appear that any unreasonable delay in the proceedings would have resulted from allowing Union's counsel to ask a series of further questions. In fact, counsel for the Union specifically stated that he needed to ask only a few questions, pointing out that the Board could in no way be prejudiced.

We believe reference should be made to the practice under Rule 15(b) of the Federal Rules of Civil Procedure, entitled Amended and Supplemental Pleadings, Amendments to Conform to the Evidence. Section 10(b) of the National Labor Relations Act, 29 U.S.C. § 160(b), states that unfair labor practice proceedings before the Board "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts of the United States under the rules of civil procedure for the district courts of the United States," and at least one court has read this provision "to mean that the procedure to be followed in hearings before the Board shall be controlled as far as practicable by the Federal Rules of Civil Procedure." Frito Co., Western Division v. NLRB, 330 F.2d 458, 465 (9th Cir. 1964) (Rule 15(b) applied to Board proceeding). See Board's Rules and Regulations §§ 101.10, 101.16, 29 C.F.R. §§ 101.10, 101.16, essentially repeating the quoted language of § 10(b) of the Act.

The relevant part of Rule 15(b) of the Federal Rules of Civil Procedure provides:

"If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence."

Professor Moore emphasizes that "amendment is to be freely allowed in order to aid in the presentation of the merits of the controversy, if the opposing party is not *actually* prejudiced." 3 Moore's Federal Practice ¶ 15.14 at p. 1011 (2d ed. 1966) (emphasis his; footnote omitted). We fail to see how the General Counsel, the Board or the discriminatees would have been "*actually* prejudiced" had the Union's counsel been allowed to question the discriminatees. Furthermore, job availability is an im-

portant issue highly relevant to the fair resolution of a back pay dispute and in only the rarest circumstances should an offer of proof on the issue be excluded. On remand, the Union must be given the right to examine any or all of the reform discriminatees (not limited to the five present at the hearing below) concerning their activities (relating to job availability and interim earnings) during the back pay period.[18] Although the Union made formal requests to amend as to only two of the discriminatees, this was sufficient to raise the issue of its right to amend as to all of them; and since the examiner made it clear that attempts to amend would be to no avail, the Union cannot be faulted for failing to do so as to the others.

*The Award to Ziegelbauer:*

The Union, in one of the few issues it had successfully raised in its pleadings, maintains that Ziegelbauer, an older man in his 60's, should have received no back pay as he lacked the necessary skills to do the work normally done by union members. It is uncontested that Ziegelbauer did not possess sufficient skill to operate heavy construction equipment, but it appears from the record that the older men in the Union received referrals for "push button" or oiling jobs—jobs requiring little or no skill. During the prediscrimination period, Ziegelbauer had received referrals for such jobs, albeit mainly due to the fact that John DeKoning, then in favor with the Union leadership, was his son-in-law. During the back pay period, Ziegelbauer lost out on these assignments. We conclude that there is sufficient evidence in the record to support the Board's finding that Ziegelbauer suffered lost wages due to the Union's discrimination.

*Interest:*

██ The Trial Examiner did not allow interest on the back pay award,

which action was in accord with the Board's former policy. See, e. g., Ellis and Watts Products, Inc., 143 N.L.R.B. 1269, 1272 (1963). The Board reversed the trial examiner, overruling the prior Board precedent, and awarded 6% interest on the award from the date of the Board's Order, dated March 23, 1965. The Union contends that such action is beyond the Board's power. We disagree.

Section 10(c) of the labor statute, 29 U.S.C. § 160(c), empowers the Board to order a respondent, found guilty of an unfair labor practice, "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter." It is entirely silent on the subject of interest. But the Board has broad discretion in determining what will effectuate the policies of the Act, Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 194, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), and is not bound by its prior precedent not to grant interest if it decides that an award of interest is consonant with the board remedial purposes of the Act. At least five other Circuits, some at length, have considered the Board's change of position with respect to the imposition of interest on back pay awards and have concluded that such action is well within the discretion of the Board. See International Bhd. of Operative Potters v. NLRB, 116 U.S.App.D.C. 35, 320 F.2d 757, 760–761 (1963); NLRB v. Globe Prods. Corp., 332 F.2d 694, 696–697 (4th Cir. 1963); NLRB v. American Compress Warehouse, Division of Frost-Whited Co., 374 F.2d 573 (5th Cir. 1967); NLRB v. Belfry Coal Corp., 331 F.2d 738, 740 (6th Cir. 1964); Marshfield Steel Co. v. NLRB, 324 F.2d 333, 337–339 (8th Cir. 1963). We follow these decisions and uphold the Board's award of interest in this case.

18. In a footnote in its brief, the Union points out that three of the discriminatees, Messrs. Batalias, Eichacker and Nagle, were claimants in a second back pay proceeding against the Union involving a back pay period overlapping the period in this case. On remand, it will, of course, be appropriate for the Board to assure that these discriminatees do not receive double recovery against the Union for the same lost wages.

Enforcement denied at this time and cause remanded for such modification of the back pay award, if any, as may be required in the light of further proceedings held consistent with this opinion on the issues of job availability and interim earnings.